ANDREW L. PACKARD (State Bar No. 168690)
ERIK M. ROPER (State Bar No. 259756)
Law Offices of Andrew L. Packard
100 Petaluma Blvd. N, Suite 301
Petaluma, CA 94952
Tel: (707) 763-7227
Fax: (415) 763-9227
E-mail: andrew@packardlawoffices.com

MICHAEL R. LOZEAU (Bar No. 142893)
DOUGLAS J. CHERMAK (Bar No. 233382)
LOZEAU DRURY LLP
1516 Oak Street, Suite 216
Alameda, California 94501
Tel: (510) 749-9102
Fax: (510) 749-9103
E-mail: mrlozeau@lozeaulaw.com

Attorneys for Plaintiff California Sportfishing Protection Alliance

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA SPORTFISHING PROTECTION ALLIANCE, a non-profit corporation; | Case No. 3:09-cv-01756-SI |
| Plaintiff, | |
| vs. | **STIPULATION TO DISMISS PLAINTIFFS' CLAIMS WITH PREJUDICE; [PROPOSED] ORDER GRANTING DISMISSAL WITH PREJUDICE [FRCP 41(a)(2)]** |
| LAKE COUNTY, LAKE COUNTY DEPARTMENT OF PUBLIC SERVICES, KIM KEVIN CLYMIRE, in his official capacity, and CHUCK MAVES, | |
| Defendants. | |

WHEREAS, on February 7, 2009, Plaintiff California Sportfishing Protection Alliance ("CSPA") provided Defendants LAKE COUNTY, LAKE COUNTY  DEPARTMENT OF PUBLIC SERVICES, KIM KEVIN CLYMIRE and CHUCK MAVES ("Defendants") with a Notice of Violations and Intent to File Suit ("CWA Notice") under Clean Water Act §505, 33 U.S.C. §1365.;

WHEREAS, on April 22, 2009, CSPA filed its Complaint against Defendants in this

STIPULATION TO DISMISS WITH PREJUDICE;                    CASE NO. 2:08-CV-01279-MCE-EFB

[PROPOSED] ORDER                                        1

927112.1

1    Court, *California Sportfishing Protection Alliance v.Lake County, et al* (USDC, N.D. Cal., Case

2    No.3:09-cv-01756-SI) and said Complaint incorporates by reference all of the allegations

3    contained in CSPA's CWA Notice;

4        WHEREAS, CSPA and Defendants, through their authorized representatives and without

5    either adjudication of CSPA's claims or admission by Defendants of any alleged violation or

6    other wrongdoing, have chosen to resolve in full by way of settlement the allegations of CSPA as

7    set forth in the CWA Notice and Complaint, thereby avoiding the costs and uncertainties of

8    further litigation.  A copy of the Settlement Agreement entered into by and between CSPA and

9    Defendants is attached hereto as Exhibit A and incorporated by reference.

10       WHEREAS, the parties submitted the Settlement Agreement via certified mail, return

11   receipt requested, to the U.S. EPA and the U.S. Department of Justice and the 45-day review

12   period set forth at 40 C.F.R. § 135.5 has been completed without objection by the agencies.

13       NOW THEREFORE, IT IS HEREBY STIPULATED and agreed to by and between the

14   parties that CSPA's claims, as set forth in the Notice and Complaint, be dismissed with prejudice

15   pursuant to Federal Rule of Civil Procedure 41(a)(2).  The parties respectfully request an order

16   from this Court dismissing the claims with prejudice.  In accordance with the Settlement

17   Agreement, the parties also request that this Court retain and have jurisdiction over the Parties

18   with respect to disputes arising under the agreement.

19

20   Dated: April 5, 2010                     LAW OFFICES OF ANDREW L. PACKARD

21

22                                           By: _//s//_____
                                             Andrew L. Packard
23                                           Attorneys for Plaintiff

24   Dated: April 5, 2010                     COUNTY OF LAKE, COUNTTY COUNSEL

25

26                                           By: _//s//_____
                                             Honorable Anita Grant
27                                           Attorneys for Defendants

28

STIPULATION TO DISMISS WITH PREJUDICE;                    CASE NO. 3:09-cv-01756-SI
[PROPOSED] ORDER                          2
927112.1

# EXHIBIT A

ANDREW L. PACKARD (Bar No. 168690)
Law Offices of Andrew L. Packard
319 Pleasant Street
Petaluma, CA 94952
Tel: (707) 763-7227
Fax: (707) 763-9229
E-mail: andrew@packardlawoffices.com

MICHAEL R. LOZEAU (Bar No. 142893)
DOUGLAS J. CHERMAK (Bar No. 233382)
Lozeau Drury LLP
1516 Oak Street, Suite 216
Alameda, California 94501
Tel: (510) 749-9102
Fax: (510) 749-9103
E-mail: mrlozeau@lozeaudrury.com

Attorneys for Plaintiff
CALIFORNIA SPORTFISHING
PROTECTION ALLIANCE

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA SPORTFISHING PROTECTION ALLIANCE, a non-profit corporation,<br><br>        Plaintiff,<br><br>    vs.<br><br>LAKE COUNTY, LAKE COUNTY DEPARTMENT OF PUBLIC SERVICES, KIM KEVIN CLYMIRE, in his official capacity, and CHUCK MAVES,<br><br>        Defendants. | Case No. 2:09-cv-01756-SI<br><br>**[Proposed]CONSENT AGREEMENT**<br><br>(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to 1387) |

**WHEREAS,** Plaintiff CALIFORNIA SPORTFISHING PROTECTION ALLIANCE

(hereinafter "CSPA") is a non-profit public benefit corporation dedicated to the preservation,

protection, and defense of the environment, wildlife, and natural resources of California's

waters;

1    **WHEREAS**, LAKE COUNTY, LAKE COUNTY  DEPARTMENT OF PUBLIC

2    SERVICES, KIM KEVIN CLYMIRE and CHUCK MAVES (collectively hereinafter

3    "COUNTY") operate an approximately 80-acre facility comprised of a landfill and recycling

4    center located at 16015 Davis Street in Clearlake, California (hereinafter, "the Facility");

5           **WHEREAS,** CSPA and COUNTY shall be collectively referred to as the "Parties;"

6           **WHEREAS**, COUNTY's operations at the Facility primarily involve the collection and

7    storage of waste materials primarily consisting of household garbage and recycling materials

8    collected by COUNTY, and storage and maintenance of equipment appurtenant thereto;

9           **WHEREAS**, storm water from the West side of the Facility primarily drains to

10   Molesworth Creek which flows to Clear Lake, which flows into Cache Creek, a tributary to the

11   Sacramento River, which drains into the Sacramento-San Joaquin Delta and ultimately the San

12   Francisco Bay;

13          **WHEREAS**, storm water from the East side of the Facility primarily drains to an

14   unnamed tributary of Cache Creek itself;

15          **WHEREAS**, a map of the Facility is attached hereto as Exhibit "A" and incorporated

16   herein by reference;

17          **WHEREAS**, storm water discharges associated with industrial activity are regulated

18   pursuant to the National Pollutant Discharge Elimination System ("NPDES"), General Permit

19   No. CAS000001 [State Water Resources Control Board], Water Quality Order No.

20   91-13-DWQ (as amended by Water Quality Order 92-12 DWQ and 97-03-DWQ), issued

21   pursuant to Section 402 of the Clean Water Act, 33 U.S.C. § 1342 (hereinafter "General

22   Permit");

23          **WHEREAS**, on February 7, 2009, CSPA provided notice of alleged violations of the

24   General Permit by COUNTY and CSPA's intention to file suit against COUNTY (the

25   "Notice") to the Administrator of the United States Environmental Protection Agency

26   ("EPA"); the Administrator of EPA Region IX; the Executive Director of the State Water

27   Resources Control Board ("State Board"); the Executive Officer of the Regional Water Quality

28

- 2 -

[PROPOSED] CONSENT AGREEMENT

1  Control Board, Central Valley Region ("Regional Board"); and to COUNTY, pursuant to

2  Section 505 of the Federal Water Pollution Control Act ("Act"), 33 U.S.C. § 1365. A true and

3  correct copy of the Notice is attached hereto as Exhibit B;

4  **WHEREAS**, CSPA filed a complaint ("Complaint") against COUNTY in the United

5  States District Court, Northern District of California on April 22, 2009;

6  **WHEREAS**, COUNTY denies the occurrence of the violations alleged in the Notice

7  and Complaint;

8  **WHEREAS**, for purposes of this Consent Agreement, the Parties stipulate that venue is

9  proper in this Court, and that COUNTY does not contest the exercise of jurisdiction by this

10  Court to enter this Consent Agreement;

11  **WHEREAS**, this Consent Agreement shall be submitted to the United States

12  Department of Justice for the 45-day statutory review period, pursuant to 33 U.S.C. § 1365(c);

13  and shall thereafter be submitted for approval by the Court, the date of which approval shall be

14  referred to herein as the "Court Approval Date;"

15  **WHEREAS,** at the time the Consent Agreement is submitted for approval to the United

16  States District Court, CSPA shall request a dismissal of the Complaint with prejudice and the

17  Parties shall stipulate and request that the Court retain jurisdiction for the enforcement of this

18  Agreement as provided herein;

19  **NOW THEREFORE IT IS HEREBY STIPULATED BETWEEN THE SETTLING**

20  **PARTIES, AND ORDERED AND DECREED BY THE COURT, AS FOLLOWS:**

21  **I.    COMMITMENTS OF COUNTY**

22  1.    **Implementation of Compliance Measures.** COUNTY shall continue to

23  implement all measures, or shall identify and implement such additional measures, as may be

24  needed to operate the Facility in full compliance with the requirements of the General Permit

25  and Clean Water Act, and shall operate the Facility in full compliance with the requirements

26  of the General Permit and Clean Water Act during the term of this Consent Agreement.

27

28

[PROPOSED] CONSENT AGREEMENT

2.      **BMP Implementation, Maintenance and Reassessment.**  In order to further reduce or prevent storm water discharges from the Facility, to the extent not already implemented, COUNTY shall implement appropriate structural and non-structural BMPs as more fully described below.  During the two-year term of this Consent Agreement, COUNTY shall maintain all structural BMPs at the site in good operating condition during the period October 1 and May 30 of each year (the "Wet Season") and as otherwise required to conform to the General Permit and the Facility's Storm Water Pollution Prevention Plan ("SWPPP").

3.      **BMP Evaluation: Constituents of Concern Compared Against EPA Benchmark Values as Set Forth in Exhibit C.**  The effectiveness of the BMPs shall be measured by comparing the results of storm water discharge samples collected and analyzed in accordance with this Agreement ("Samples") with the values as set forth in Exhibit C, attached hereto and incorporated herein by reference.   If the constituent concentration values of any such Samples exceed the values set forth in Exhibit C, COUNTY agrees to comply with the Action Memorandum requirements set forth below.

4.      **Collection and Discharge Points Identified On SWWPP Map Attached Hereto as Exhibit A.**  Within sixty (60) days of the Court Approval, COUNTY shall eliminate all storm water collection and discharge points except those presently shown on Exhibit A hereto.  (the revised SWPPP facility map, which shall be submitted at the time of the mutual execution of this Consent Agreement, is attached hereto as Exhibit A).

5.      **SWPPP Amendments.**  Within 30 days of the Court Approval Date, COUNTY shall formally amend its SWPPP to include all compliance measures set forth herein as well as all requirements of the General Permit.  COUNTY shall submit its revised SWPPP for comment to CSPA within 15 days of the execution of this Agreement.

6.      **Initial Revised Best Management Practices.**  Within 30 days of the Court Approval Date, COUNTY shall  implement the following Best Management Practices at the Facility:

- 4 -

a.   *Enlarge/Upgrade Detention Pond.*  Enlarge the existing sediment detention pond in the borrow area along the unnamed tributary of Cache Creek to a capacity sufficient to handle a 25-year/24-hour storm event; develop maintenance program to ensure this pond capacity.  The parties understand and agree that, as to this BMP, such an enlargement cannot take place until the conclusion of the 2010 Wet Season; therefore this BMP shall be implemented on or before September 15, 2010.

b.   *Improve Sweeping & Elimination of Visible Tracking.*  A regenerative sweeper shall be employed weekly on all paved surfaces of the facility and adjacent roads throughout the year.  In addition, a mechanical sweeper shall be employed on all paved surfaces of the facility and adjacent roads daily during the wet season.

c.   *Install Erosion Controls.*  All barren and disturbed areas will be seeded. Straw wattles, silt fences, and hay bales shall be installed annually in the areas specified on the updated facility SWPPP map as necessary to prevent off-site transport of eroded soils.  All unpaved roads and earthen berms shall be subject to observation monitoring as described in the revised SWPPP.

d.   *Winterization Plan.*  A winterization plan shall be prepared annually to identify specific erosion and storm water controls to be implemented, together with the specific location of, and the time frame for implementation of, each such storm water control measure.

e.   *Improve Grading.*  The perimeter of the landfill's operation area shall be graded in a way that will best prevent storm water from creating rills, channels and gullies;

f.   *Upgrade Sediment Controls for Access Road Surfaces.*  Repair and prevent ongoing roadbed erosion, especially on Facility's steeper roads, such as the road on the West side of the Facility leading down to the leachate collection pond;

g.   *Facility Maintenance Schedule.*  COUNTY shall develop a comprehensive facility cleaning, sweeping, maintenance, inspection and employee

- 5 -

1   training schedule and logs for each aspect of same, including the date, time and the

2   person conducting such activities.

3        h.   *Installation of Filtration Media – Type and Discharge Points to be*

4   *Determined.*   At the conclusion of the 2012 Wet Season, COUNTY shall conduct an

5   evaluation of all of its Samples to determine whether the BAT and BCT standards

6   under the General Permit require additional filtration media to be installed at any

7   Facility discharge point or points to reduce contaminant loading in the Facility's storm

8   water discharges.  This evaluation shall be provided to CSPA in writing no later than

9   July 1, 2012; in the event that the parties disagree as to whether or how much

10   additional filtration is required under the General Permit, the dispute shall be resolved

11   pursuant to the dispute resolution provisions herein below.

12   <u>**Sampling and Monitoring**</u>

13        7.   **Collection and Discharge Point Inspection.**  Within 30 days of the Court

14   Approval Date, COUNTY agrees to amend their SWPPP as attached here to require the

15   inspection of all storm water collection and discharge points at the Facility weekly during the

16   Wet Season and just prior to forecasted storm events that may reasonably be expected to

17   result in a discharge from the Facility.

18        8.   **Sampling Frequency.**  During each of the 2010-2011 and 2011-2012 Wet

19   Seasons (October 1 – May 31), COUNTY shall collect three (3) storm water samples per Wet

20   Season from each Facility Discharge Point according to the following sampling schedule and

21   conditions:

22        a.   Except as otherwise provided in subparagraph b. below, COUNTY shall

23   collect samples during storm events that meet each of the following criteria (hereafter,

24   "Qualifying Storm Events"):  (i) the samples are preceded by at least three (3)

25   working days during which no storm water discharges have occurred from the

26   Facility; (ii) the samples are collected within the first hour that flow is observed at the

- 6 -

Facility Discharge Points; and (iii) the samples can be collected during daylight operating hours.

b.      If fewer than three Qualifying Storm Events occur during any Wet Season, COUNTY shall be obligated to take samples only during the Qualifying Storm Events that do occur.

c.      In the event no Qualifying Storm Event has occurred by January 31 of a particular Wet Season, COUNTY shall continue to make best efforts to comply with the sampling frequency obligations set forth herein and shall collect samples from storm events that are non-qualifying to the extent they are not preceded by three (3) working days during which no storm water discharges have occurred (hereafter, "Non-qualifying Storm Events").  Samples from Non-qualifying Storm Events may be used to satisfy the requirements of subparagraph (a) if an insufficient number of Qualifying Storm Events has occurred in any given Wet Season.

9.      **Storm Event Log.**  After the Court Approval Date, COUNTY shall maintain a storm event log at the Facility for those dates on which storm events have occurred, including the date, weather conditions, and estimated duration of discharge (if any).  Storm event logs shall be made available to CSPA within ten (10) working days of a written request by CSPA.

10.     **Sample Analysis.**  After the Court Approval Date, COUNTY shall analyze each storm water sample collected for each of the constituents listed in Exhibit C.  As to those constituents shown on Exhibit C (except Oil & Grease, TSS, pH, Specific Conductance and Iron), where there is no detection of any of said constituents in four consecutive samples (two of which samples can be samples collected in the 2009-2010 Wet Season) at a given discharge point, sampling for that constituent at that specific discharge point may be discontinued.

11.     **Sample Quality Controls, Reporting.**  All storm water samples collected pursuant to this Consent Agreement shall be analyzed by a laboratory accredited by the State of California for such analysis.  All samples collected from the Facility shall be delivered to

[PROPOSED] CONSENT AGREEMENT

1    the laboratory as soon as possible to ensure that sample "hold time" is not exceeded.  Sample

2    results shall be reported to COUNTY within ten (10) days of laboratory receipt of the

3    sample.  Analytical methods used by the laboratory shall be adequate to detect the individual

4    constituents at or below the values specified on Exhibit C.  Sampling results shall be

5    provided to CSPA within ten (10) calendar days of Defendants' receipt of the laboratory

6    report from each sampling event.

7        12.    **Action Memorandum Requirements.**  At the conclusion of each Wet Season

8    during the term of this Agreement, COUNTY shall compare the constituent concentrations

9    found in its storm water samples with the values set forth in Exhibit C.  If any sample result

10   for any constituent exceeds the benchmark value specified on Exhibit C for that constituent,

11   COUNTY shall prepare a written statement addressing each such exceedance(s), the possible

12   cause and/or source of the exceedance, revisions to existing or additional non-structural and

13   structural BMPs proposed to be implemented to attempt to reduce or prevent subsequent

14   exceedances of the values specified on Exhibit C, and a reasonable schedule to implement

15   the proposed measures (Action Memorandum).  The Action Memorandum shall be provided

16   to CSPA upon completion, but in no event later than July 1st following each of the 2010-2011

17   and 2011-2012 Wet Seasons.  BMP revisions and additions may include, but are not limited

18   to, further material improvements to the storm water collection and discharge system,

19   increasing frequency of facility sweeping, changing the type and extent of storm water

20   filtration media or modifying other industrial activities or management practices at the

21   Facility.

22       13.    **CSPA Evaluation of Action Memorandum.**  CSPA may review and comment

23   on an Action Memorandum and suggest any additional pollution prevention measures it

24   believes are appropriate.  Upon written request by CSPA within twenty-one days of receipt of

25   said Memorandum, COUNTY agrees to meet and confer in good faith regarding the contents

26   of the Action Memorandum, the adequacy of the recommended BMPs in reducing

27   constituent levels in storm water discharges to levels at or below those specified on Exhibit

28

C, and any suggestions by CSPA regarding additional pollution prevention measures. Upon request by CSPA, any such meet and confer may occur at the Facility so that CSPA may conduct a site inspection. If within 15 days of the meet and confer, the parties do not agree on the adequacy of the additional measures set forth in the Action Memorandum, and the parties cannot otherwise resolve the dispute, CSPA may file a motion for appropriate injunctive relief with the District Court. The Parties shall be entitled to seek fees and costs incurred in any such motion, and such fees and costs shall be awarded, pursuant to the provisions set forth in Section 505(d) of the Clean Water Act, 33 U.S.C. §1365(d), and applicable case law interpreting such provision. Any concurrence or failure to provide comments to an Action Memorandum by CSPA with regard to the reasonableness of any additional measures proposed or implemented by COUNTY shall not be deemed to be an admission by CSPA of the adequacy of such measures should they fail to reduce the constituent concentrations in storm water discharged from the Facility to levels at or below the values specified on Exhibit C.

14. **Inspections.** In addition to any site inspections as set forth above , COUNTY shall permit representatives of CSPA to perform up to three (3) physical inspections of the Facility (which may include sampling, photographing, and/or videotaping) during the term of this Consent Agreement. Said inspection dates shall be selected by CSPA subject to meet and confer with the COUNTY to ensure that any such inspection is not unduly disruptive to the operation of the facility. All such inspections shall occur during normal business hours and shall be preceded by forty-eight (48) hours notice. Defendants shall not make any alterations to Facility conditions during the period between receiving CSPA's notice and the start of the inspection that Defendants would not otherwise have made but for receiving notice of CSPA's request to allow  a physical inspection of the Facility. Nothing here shall be construed to prevent Defendants from continuing to implement any BMPs identified in its SWPPP during the period prior to such an inspection.

15.     **Reporting Obligations.** During the term of this Consent Agreement, COUNTY shall contemporaneously provide CSPA with copies of all documents submitted to the Regional Board or State Board, concerning storm water discharges from the Facility, including but not limited to, all Annual Reports, correspondence or other communications submitted to the Regional Board or State Board as required by the General Permit. Such documents and reports shall be provided to CSPA pursuant to the Notice provisions herein and contemporaneously with Defendants' submission to such agency.

16.     **Amending Facility SWPPP.** Within thirty (30) days after the Court Approval Date, COUNTY shall amend the Facility SWPPP to incorporate all changes, improvements and BMPs set forth in this Consent Agreement and otherwise agreed to by the Parties or ordered by the Court. COUNTY shall provide a copy of the amended SWPPP to CSPA within fourteen (14) days of amendment. COUNTY shall also provide CSPA with copies of any other Facility SWPPP amendments made during the term of the Consent Agreement within fourteen (14) days of such amendment.

## II.     MITIGATION, FEES AND COSTS

17.     As mitigation of the Clean Water Act violations alleged in the Complaint, COUNTY agrees to pay the sum of $35,000 within twenty (20) days after the Court Approval Date to the Rose Foundation for Communities and the Environment for projects relating to the reduction, prevention or mitigation of, or research on, the effects of discharges of pollutants in storm water to Lake County water bodies or, upon diligent efforts finding no such project in Lake County,  to the Sacramento-San Joaquin River Delta and the San Francisco Bay.

18.     COUNTY agrees to reimburse CSPA in the amount of  $55,000 to defray CSPA's reasonable investigative, expert, consultant, and attorney's fees and costs all other costs incurred as a result of investigation the activities at the Facility, preparing the Notices, and negotiating a resolution of this action. Such payment shall be made payment to the Law

1   Offices of Andrew L. Packard Attorney-Client Trust Account and remitted to the Law

2   Offices of Andrew L. Packard within seven (7) days after the Court approval date.

3        19.    COUNTY agrees to contribute a total of $10,000 per year for each of the two

4   years covered by this Consent Agreement for a total of $20,000 to a compliance monitoring

5   fund maintained by CSPA to defray CSPA's reasonable costs associated with monitoring

6   COUNTY's compliance with this Consent Agreement which fees include the inspections

7   described in paragraph 14 herein.  Compliance monitoring activities may include but shall

8   not be limited to site inspections, review of water quality sampling reports, review of annual

9   reports, discussions with representatives of COUNTY concerning the Action Memorandum

10  referenced above, preparation for and participation in meet and confer sessions and

11  mediation, water quality sampling, and compliance-related activities.  The first such payment

12  shall be remitted to Law Offices of Andrew L. Packard within seven (7) days of the Court

13  Approval Date and the second such payment shall be remitted to the Law Offices of Andrew

14  L. Packard on or before May 1, 2010; both payments shall be made payable to the Law

15  Offices of Andrew L. Packard Attorney Client Trust Account.

16  **III.   DISPUTE RESOLUTION AND ENFORCEMENT OF CONSENT AGREEMENT**

17       20.    If a dispute under this Consent Agreement arises, or either Party believes that a

18  breach of this Consent Decree has occurred, the Parties shall meet and confer within thirty

19  (30) days of receiving written notification from the other Party of a request for a meeting to

20  determine whether a violation has occurred and to develop a mutually agreed upon plan,

21  including implementation dates, to resolve the dispute.  If the Parties fail to meet and confer

22  or the meet-and-confer does not resolve the issue, either Party shall be entitled to all rights

23  and remedies under the law, including filing a motion with the District Court of California,

24  Northern District, which shall retain jurisdiction over the Action for the limited purposes of

25  enforcement of the terms of this Consent Agreement.  The Parties shall be entitled to seek

26  fees and costs incurred in any such motion, and such fees and costs shall be awarded,

27

28

1  pursuant to the provisions set forth in Section 505(d) of the Clean Water Act, 33 U.S.C.

2  §1365(d), and applicable case law interpreting such provision.

3       21.   **CSPA Waiver and Release of COUNTY.**  Upon Court approval and entry of

4  this Consent Agreement, CSPA, on its own behalf and on behalf of its officers, directors,

5  employees, members, parent, subsidiaries, and affiliates, and each of their successors and

6  assigns, and its agents, attorneys, and other representatives, releases all persons including,

7  without limitation, COUNTY and their officers, directors, employees, shareholders, parents,

8  subsidiaries, and affiliates, and each of their predecessors, successors and assigns, and each

9  of their agents, attorneys, consultants, and other representatives (each a "Released Defendant

10  Party") from, and waives all claims which arise from or pertain to this action, including,

11  without limitation, all claims for injunctive relief, damages, penalties, fines, sanctions,

12  mitigation, fees (including fees of attorneys, experts, and others), costs, expenses or any other

13  sum incurred or claimed or which could have been claimed for matters associated with or

14  related to the Notice issued by CSPA in this action, including, without limitation, all such

15  matters with respect to the alleged failure of COUNTY or any other person to comply with

16  all or any portion of the Clean Water Act at the Facility, up to the Court Approval Date

17  (hereinafter "Claims"), except as specifically provided for in this Consent Agreement;

18       22.   **COUNTY Waiver and Release of CSPA.**  COUNTY, on their own behalf

19  and on behalf of those Released Defendant Parties under their control, release CSPA (and its

20  officers, directors, employees, members, parents, subsidiaries, and affiliates, and each of

21  their successors and assigns, and its agents, attorneys, and other representative) from, and

22  waives all claims which arise from or pertain to this action, including all claims for fees

23  (including fees of attorneys, experts, and others), costs, expenses or any other sum incurred

24  or claimed or which could have been claimed for matters associated with or related to this

25  Action.

26       23.   **Stipulated Dismissal.**  Upon the Court Approval Date, the Parties shall file

27  with the Court a Stipulation and Order that shall provide that:

28

- 12 -

a.     The Complaint and all claims therein shall be dismissed with prejudice pursuant to Federal Rule of Civil Procedure 41(a)(2); and

b.     The Court shall retain and have jurisdiction over the Parties with respect to disputes arising under this Agreement.

24.     **No Admission.**  The Parties enter into this Consent Agreement for the purpose of avoiding prolonged and costly litigation.  Nothing in this Consent Agreement shall be construed as, and COUNTY expressly do not intend to imply, an admission as to any fact, finding, issue of law, or violation of law, nor shall compliance with this Consent Agreement constitute or be construed as an admission by COUNTY of any fact, finding, conclusion, issue of law, or violation of law.  However, this paragraph shall not diminish or otherwise affect the obligation, responsibilities, and duties of the Parties under this Consent Agreement.

## V.     Miscellaneous Provisions

25.     The Consent Agreement shall terminate on October 1, 2012.

26.     The Consent Agreement may be executed in one or more counterparts which, taken together, shall be deemed to constitute one and the same document.

27.     In the event that any of the provisions of this Consent Agreement is held by a court to be unenforceable, the validity of the enforceable provisions shall not be adversely affected.

28.     The language in all parts of this Consent Agreement, unless otherwise stated, shall be construed according to its plain and ordinary meaning.

29.     The undersigned are authorized to execute this Consent Agreement on behalf of their respective parties and have read, understood and agreed to all of the terms and conditions of this Consent Agreement.

30.     All agreements, covenants, representations and warranties, express or implied, oral or written, of the Parties concerning the subject matter of this Consent Agreement are contained herein.

- 13 -

31.     **Impossibility of Performance**. Where implementation of the actions set forth in this Agreement, within the deadlines set forth in those paragraphs, becomes impossible due to weather and/or soil conditions, despite the timely good faith efforts of the COUNTY, the COUNTY shall notify CSPA in writing within seven (7) days of the date that the failure becomes apparent and shall describe the reason for the non-performance. The parties agree to meet and confer in good faith concerning the non-performance and, where the parties concur that the non-performance was or is impossible, despite the timely good faith efforts of the COUNTY, new performance deadlines shall be established. In the event the parties cannot timely agree upon the terms of such a stipulation, either of the parties has the right to invoke the dispute resolution procedure described herein.

32.     For the period beginning on the Effective date and ending on October1, 2012, CSPA agrees that neither CSPA, its officers, executive staff, members of its governing board nor any organization under the control of CSPA, its officers, executive staff, or members of its governing board, will file any lawsuit against the COUNTY seeking relief for alleged violations of the Clean Water Act or violations of the General Permit. CSPA further agrees that beginning on the Effective date and ending on October 1, 2012, CSPA will not support other lawsuits, by providing financial assistance, personnel time or other affirmative actions, against the COUNTY that may be proposed by other groups or individuals who would rely upon the citizen suit provision of the Clean Water Act to challenge the COUNTY's compliance with the Clean Water Act or the General Permit.

33.     **Notices.** Any notices or documents required or provided for by this Consent Agreement or related thereto that are to be provided to CSPA pursuant to this Consent Agreement shall be hand-delivered or sent by U.S. Mail, postage prepaid, and addressed as follows or, in the alternative, shall be sent by electronic mail transmission to the email addresses listed below or by confirmed facsimile:

Bill Jennings, Executive Director
California Sportfishing Protection Alliance

- 14 -

3536 Rainier Avenue
Stockton, CA 95204
DeltaKeep@aol.com
Fax:  209-464-1028

With copies sent to:

Andrew L. Packard
Law Offices of Andrew L. Packard
319 Pleasant Street
Petaluma, CA  94952
andrew@packardlawoffices.com
Fax: (707) 763-9227

And to:

Michael R. Lozeau
Law Office of Michael R. Lozeau
1516 Oak Street, Suite 216
Alameda, CA 94501
E-mail:  mrlozeau@lozeaulaw.com
Fax:  (510) 749-9103

Any notices or documents required or provided for by this Consent Agreement or related

thereto that are to be provided to COUNTY pursuant to this Consent Agreement shall be sent

by U.S. Mail, postage prepaid, and addressed as follows or, in the alternative, shall be sent by

electronic mail transmission to the email addresses listed below or by confirmed facsimile:

County of Lake
Attn: Public Services Director
333 Second Street
Lakeport, CA. 95453
Fax: 707-262-0973
Email: kim_c@co.lake.ca.us

With copies sent to:

Hon. Anita L. Grant, County Counsel
County of Lake
255 North Forbes Street

- 15 -

[PROPOSED] CONSENT AGREEMENT

Lakeport, CA 95453
Fax: 707-263-2321
Email: Anitag@co.lake.ca.us

Each party shall promptly notify the other of any change in the above-listed contact information.

34.     Signatures of the Parties transmitted by facsimile shall be deemed binding.

35.     No Party shall be considered to be in default in the performance of any of its obligations when a failure to perform is due to a "Force Majeure." A Force Majeure event is any circumstances beyond the Party's control, including, without limitation, any act of God, war, fire, earthquake, flood, and restraint by court order or public authority. A Force Majeure event does not include normal inclement weather, such as anything less than or equal to a 100 year/24-hour storm event, or inability to pay. Any Party seeking to rely upon this paragraph shall have the burden of establishing that it could not reasonably have been expected to avoid, and which by exercise of due diligence has been unable to overcome, the Force Majeure.

36.     If for any reason the Court should decline to approve this Consent Agreement in the form presented, the Parties shall use their best efforts to work together to modify the Consent Agreement within thirty (30) days so that it is acceptable to the Court. If the Parties are unable to modify this Consent Agreement in a mutually acceptable manner, this Consent Agreement shall become null and void.

//

//

//

//

//

//

- 16 -

1    37.    The settling Parties hereto enter into this Consent Agreement, Order and Final

2    Judgment and submit it to the Court for its approval and entry as a final judgment.

3

4    Dated: _4 Feb 2010_    California Sportfishing Protection Alliance

5                           By:    _Bill Jennings_

6                                  Bill Jennings, Executive Director

7

8    Dated: _____    County of Lake

9

10                            By:    _____

11                                   Anthony Farrington, Chair
                                     Lake County Board of Supervisors

12

13                            By:    _____

14                                   Anita L. Grant
                                     County Counsel
15                                   County of Lake

16

17

18

19

20

21

22

23

24

25

26

27

28
                                        - 17 -
                              [PROPOSED] CONSENT AGREEMENT

37.   The settling Parties hereto enter into this Consent Agreement, Order and Final Judgment and submit it to the Court for its approval and entry as a final judgment.

Dated: _____   California Sportfishing Protection Alliance

By: _____
    Bill Jennings, Executive Director

Dated: _2-4-10_   County of Lake

By: _____
    Anthony Farrington, Chair
    Lake County Board of Supervisors

By: _____
    Anita L. Grant
    County Counsel
    County of Lake

- 17 -
[PROPOSED] CONSENT AGREEMENT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT A – Facility SWPPP Map**



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT B -- CSPA's February 7, 2009 Notice of Violation**

700415122v1

 **California Sportfishing Protection Alliance**
*"An Advocate for Fisheries, Habitat and Water Quality"*
3536 Rainier Avenue, Stockton, CA 95204
Tel: 209-464-5067, Fax: 209-464-1028, E: deltakeep@aol.com

February 7, 2009

**VIA CERTIFIED MAIL -RETURN RECEIPT REQUESTED**

Mr. Kim Kevin Clymire, Director
County of Lake Public Services Department
333 Second Street
Lakeport, CA 95453

Mr. Chuck Maves, Landfill Supervisor
Eastlake Sanitary Landfill
16015 Davis Street
Clearlake, CA 95422

**Re:     Notice of Violations and Intent to File Suit Under the Federal Water
         Pollution Control Act**

Dear Director Clymire and Mr. Maves:

        I am writing on behalf of the California Sportfishing Protection Alliance
("CSPA") in regard to violations of the Clean Water Act ("the Act") occurring at the
Lake County Eastlake Sanitary Landfill located at 16015 Davis Street, Clearlake,
California 95422. The WDID identification number for the Landfill is 5S17I014868.
CSPA is a non-profit public benefit corporation dedicated to the preservation, protection,
and defense of the environment, wildlife and natural resources of Clear Lake, Cache
Creek, the Sacramento River and other California waters. This letter is being sent to you
as the responsible owners, officers, or operators of the landfill, hereinafter referred to as
"Eastlake Sanitary Landfill" or the "Landfill".

        This letter addresses Eastlake Sanitary Landfill's unlawful discharges of
pollutants from the Landfill to Molesworth Creek, which ultimately discharges into Clear
Lake, and an unnamed tributary of Cache Creek, which ultimately discharges to the
Sacramento - San Joaquin Delta. This letter addresses ongoing violations of the
substantive and procedural requirements of the Clean Water Act and National Pollutant
Discharge Elimination System ("NPDES") General Permit No. CAS000001, State Water
Resources Control Board Water Quality Order No. 92-12-DWQ, as amended by Order
No. 97-03-DWQ ("General Industrial Storm Water Permit").

Notice of Violation and Intent To File Suit
February 7, 2009
Page 2 of 20

Section 505(b) of the Clean Water Act provides that sixty (60) days prior to the initiation of a civil action under Section 505(a) of the Act (33 U.S.C. § 1365(a)), a citizen must give notice of intent to file suit. Notice must be given to the alleged violator, the U.S. Environmental Protection Agency ("the EPA"), and the State in which the violations occur.

As required by the Clean Water Act, this Notice of Violation and Intent to File Suit provides notice of the violations that have occurred, and continue to occur, at the Landfill. Consequently, Eastlake Sanitary Landfill is hereby placed on formal notice by CSPA that, after the expiration of sixty (60) days from the date of this Notice of Violation and Intent to File Suit, CSPA intends to file suit in federal court against Eastlake Sanitary Landfill under Section 505(a) of the Clean Water Act (33 U.S.C. § 1365(a)), for violations of the Clean Water Act and the General Industrial Storm Water Permit. These violations are described more fully below.

## I.    Background.

The Eastlake Sanitary Landfill is an 80-acre sanitary landfill operated by the Lake County Public Services Department. The Landfill occupies a former canyon in the headwaters of Molesworth Creek, which now primarily carries surface water in the winter and early spring months to Clear Lake. Along the eastern border of the Landfill, an unnamed creek receives runoff from the Landfill and discharges into Cache Creek, which is a tributary to the Sacramento River, which ultimately empties into the Sacramento-San Joaquin Delta. All receiving waters of discharge from the Landfill are waters of the State and of the United States within the meaning of the Clean Water Act.

According to the Landfill's 1998 Storm Water Pollution Prevention Plan ("1998 SWPPP"), although the Landfill commenced operations in 1972, the County did not submit a Notice of Intent to be covered by the General Industrial Storm Water Permit until December 14, 1998. The Landfill is also operated under Waste Discharge Order No. 98-159.

Operations at the Landfill are conducted throughout the 80-acre property, seven days a week, from approximately 7:30 a.m. to 3:00 p.m. Operations are divided into at least eight different operational areas, which include:

- **Landfill Entrance and Gate House Area:** Provides access for public and private waste haulers and landfill and recycling buy-back center customers and employees. Potential pollutants discharged to storm water at this location include suspended and dissolved solids, oil, lubricants, tire particulate matter, exhaust gas particulates, pH-affecting substances, organic compounds and other oxygen-demanding materials, paper and plastic litter, and metals.

- **Solid Waste Disposal:** As of 1998, the Landfill consisted of one 31-acre waste management unit with two fill areas. Disposal operations have been

conducted in the 22-acre Area I since 1975.  Haulers deliver waste directly to
the canyon area of Area I and employ a tipping pad to empty waste loads into
the Area.  Waste is spread and compacted by heavy equipment and green
waste and soil are used for daily and intermediate cover.  Discharges from
Area I are captured in the leachate ponds, or released to Molesworth Creek or
an unnamed tributary of Cache Creek.  According to the Landfill's 1998
SWPPP, 6.5 acres of the 9-acre Area II went into operation in the fall of 1999.
Potential pollutants discharged to storm water at these Areas include
suspended and dissolved solids, oil, lubricants, tire particulate matter, exhaust
gas particulates, pH-affecting substances, paper, plastic, other waste debris,
organic materials and other oxygen-demanding materials, and metals.

- **Soil Borrow Area:**  This area provides soil for daily and intermediate cover
  of waste disposed at Area I.  Soil is excavated with heavy equipment and
  transported to the waste areas to be used as cover.  According to the 1998
  SWPPP, approximately 3,600 cubic yards are maintained daily at the
  stockpile.  Potential pollutants discharged to storm water in this Area include
  suspended and dissolved solids, oil, lubricants, tire particulate matter, exhaust
  gas particulates, pH-affecting, and metals.  Run-off is discharged to either
  Molesworth Creek or the unnamed tributary of Cache Creek.

- **Leachate Collection and Storage Pond:**  A 600,000-gallon leachate
  collection and storage pond is located at the base of Areas I and II.  Leachate
  from the pond is to be pumped into the sanitary sewer and conveyed to the
  Southeast Regional Wastewater Treatment Plant.  According to the 1998
  SWPPP, pollutants in this area are limited to sediments such as soil and
  gravel. CSPA is informed and believes that *leachate itself is also discharged*
  and that other pollutants, including pH-affecting substances, organic carbons,
  COD, ammonia and other nitrate-related chemicals, and metals are also
  discharged from this area to Molesworth Creek.

- **Mobile Fueling Area:**  A mobile, 1,000 gallon diesel fuel tank is kept near
  landfill operations for easy refueling of heavy equipment.  Fuel is periodically
  loaded into the tank by a commercial fuel truck.  The 1998 SWPPP fails to
  address potential pollutants arising from the Mobile Fueling Area.  CSPA is
  informed and believes that pollutants arising from use and refueling of the
  mobile fueling tank include fuels, lubricants, oil, tire particulate, sediment,
  increased erosion, gas exhaust particulates, tire particulates, pH-affecting
  substances, and metals.

- **Recycling and Buy-back Center:**  According to the 1998 Landfill SWPPP,
  the Recycling and Buy Back Area is operated by Upper Valley Disposal under
  contract with Lake County.  The facility purchases recyclables and offers
  recycling of a variety of waste types, including used oil, batteries, "white
  goods", steel, and tires.  Used oil is placed in an above ground storage tank.

White goods are drained, and together with assorted steel and other scrap metals are collected, compacted and stored in this area. Yard waste and wood waste is ground and used as an alternative daily cover or moved off-site to be composted. Potential pollutants include paper, plastic, organic material and other oxygen-demanding materials, broken glass, oils, grease, fuels, lubricants, soil, gravel, pH-affecting substances, and metals. Discharges from this area to are released to Molesworth Creek and/or the unnamed tributary of Cache Creek.

- **Hazmat Building:** The hazmat is constructed of steel on a concrete foundation and intended to provide cover for hazardous materials. Stored hazardous materials are to be removed at least once every 4 weeks. The 1998 Landfill SWPPP claims that there are no activities that pose a potential to contribute to pollutants in storm water. CSPA disagrees and believes that regular use in the area may result in not only exposure of hazardous materials to storm water, but also sediment, pH-affecting substances, organic chemicals and other oxygen-demanding materials, fuels, lubricants, oils, grease, and metals. Storm water discharged from this area comingles with storm water from Area I, which discharges to Molesworth Creek and the unnamed tributary of Cache Creek.

- **Equipment Shop:** Maintenance of heavy machinery conducted in and near the Equipment Shop includes cleaning, lubrication, and repairs. Lubricants and other fluids are drained and stored on-site. Some maintenance activities are conducted outside and equipment may be temporarily stored outside. Potential pollutants include sediment, oils, lubricants, grease, exhaust gas particulates, tire particulates, pH-affecting materials, organic carbons and other oxygen-demanding materials, and metals. Discharges are in a sheet flow from the area and/or to the landfill access road.

1998 SWPPP, at 1-8. In all, a variety of pollutants come into contact with storm water at the site, including sediment and other eroded materials, pH-affecting substances, fuels, lubricants, greases and oils, organic chemicals and oxygen-demanding materials, volatile organic compounds ("VOCs"), paper and plastic litter, and metals.

The Central Valley Regional Water Quality Control Board (the "Regional Board" or "Board") has established water quality standards for Clear Lake, Cache Creek, the Sacramento River and the Delta in the "Water Quality Control Plan for the Sacramento River and San Joaquin River Basins," generally referred to as the Basin Plan. The Basin Plan includes a narrative toxicity standard which states that "[a]ll waters shall be maintained free of toxic substances in concentrations that produce detrimental physiological responses in human, plant, animal, or aquatic life." For the Delta, the Basin Plan establishes standards for several metals, including (at a hardness of 40 mg/L): arsenic – 0.01 mg/L; copper – 0.01 mg/L; iron – 0.3 mg/L; and zinc – 0.1 mg/L. *Id.* at III-3.00, Table IIII-1. The Basin Plan states that "[a]t a minimum, water designated for

Notice of Violation and Intent To File Suit
February 7, 2009
Page 5 of 20

use as domestic or municipal supply (MUN) shall not contain lead in excess of 0.015 mg/L." *Id.* at III-3.00. The Basin Plan also provides that "[t]he pH shall not be depressed below 6.5 nor raised above 8.5." *Id.* at III-6.00. The Basin Plan also prohibits the discharges of oil and grease, stating that "[w]aters shall not contain oils, greases, waxes, or other materials in concentrations that cause nuisance, result in a visible film or coating on the surface of the water or on objects in the water, or otherwise adversely affect beneficial uses." *Id.* at III-5.00.

The Basin Plan also provides that "[a]t a minimum, water designated for use as domestic or municipal supply (MUN) shall not contain concentrations of chemical constituents in excess of the maximum contaminant levels (MCLs)." *Id.* at III-3.0. CSPA is informed and believes that the Landfill discharges storm water containing many of the pollutants covered under the prohibitions for MCLs, including a recommended water quality criteria for aluminum for freshwater aquatic life protection of 0.087 mg/L. EPA has established a secondary MCL, consumer acceptance limit for aluminum of 0.05 mg/L to 0.2 mg/L. EPA has established a secondary MCL, consumer acceptance limit for zinc of 5 mg/L. EPA has established a primary MCL, consumer acceptance limit for the following: chromium – 0.1 mg/L; copper – 1.3 mg/L; and lead – 0.0 (zero) mg/L. *See* http://www.epa.gov/safewater/ mcl.html. The California Department of Health Services has also established the following MCL, consumer acceptance levels for chemicals potentially discharged from the Landfill, including: aluminum – 1 mg/L (primary) and 0.2 mg/L (secondary); chromium – 0.5 mg/L (primary); copper – 1.0 mg/L (secondary); iron – 0.3 mg/L; and zinc – 5 mg/L. *See* California Code of Regulations, title 22, §§ 64431, 64449.

EPA has also issued numeric receiving water limits for certain toxic pollutants in California surface waters, commonly known as the California Toxics Rule ("CTR"). 40 CFR §131.38. The CTR establishes the following numeric limits for freshwater surface waters for pollutants likely to be found in storm water discharges from the Landfill: arsenic – 0.34 mg/L (maximum concentration) and 0.150 mg/L (continuous concentration); chromium (III) – 0.550 mg/L (maximum concentration) and 0.180 mg/L (continuous concentration); copper – 0.013 mg/L (maximum concentration) and 0.009 mg/L (continuous concentration); lead – 0.065 mg/L (maximum concentration) and 0.0025 mg/L (continuous concentration).

The Regional Board has identified waters of the Delta as failing to meet water quality standards for unknown toxicity, electrical conductivity, numerous pesticides, and mercury. *See* http://www.swrcb.ca.gov/tmdl/docs/2002reg5303dlist.pdf. The Regional Board has also identified the waters of Cache Creek as impaired for mercury and unknown toxicity. *Id.* Discharges of listed pollutants into an impaired surface water may be deemed a "contribution" to the exceedance of the CTR, a water quality standard, and may indicate a failure on the part of a discharger to implement adequate storm water pollution control measures. *See Waterkeepers Northern Cal. v. Ag Indus. Mfg., Inc.*, 375 F.3d 913, 918 (9th Cir. 2004); *see also Waterkeepers Northern Cal. v. Ag Indus. Mfg., Inc.*, 2005 WL 2001037 at *3, 5 (E.D. Cal., Aug. 19, 2005) (finding that a discharger

Notice of Violation and Intent To File Suit
February 7, 2009
Page 6 of 20

covered by the General Industrial Storm Water Permit was "subject to effluent limitation as to certain pollutants, including zinc, lead, copper, aluminum and lead" under the CTR).

The General Industrial Storm Water Permit incorporates benchmark levels established by EPA as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite best available technology economically achievable ("BAT") and best conventional pollutant control technology ("BCT"). The following benchmarks have been established for pollutants discharged by Eastlake Sanitary Landfill:  pH – 6.0-9.0; total suspended solids – 100 mg/L; oil & grease – 15.0 mg/L; iron – 1.0 mg/L; magnesium – 0.0636 mg/L; and nitrate+nitrite – 0.68 mg/L. The State Water Quality Control Board also recently proposed adding a benchmark level for specific conductance of 200 μmho/cm. Additional parameters for pollutants that CSPA believes are discharged from the Landfill include: aluminum – 0.75 mg/L; ammonia – 19 mg/L; arsenic – 0.16854 mg/L; biological oxygen demand ("BOD") – 15 mg/L; cadmium – 0.0159 mg/L; chemical oxygen demand ("COD") – 120 mg/L; copper – 0.0636 mg/L; lead – 0.0816 mg/L; manganese – 1.0 mg/L; mercury – 0.0024 mg/L; nickel – 1.417 mg/L; selenium – 0.2385 mg/L; silver – 0.318 mg/L; and zinc – 0.117 mg/L.

## II.    Recurring Pollutant Discharges in Violation of the NPDES Permit.

Eastlake Sanitary Landfill has violated and continues to violate the terms and conditions of the General Permit by discharging storm water containing pollutants in violation of the terms of the Permit. Section 402(p) of the Act prohibits the discharge of storm water associated with industrial activities, except as permitted under an NPDES permit (33 U.S.C. § 1342) such as the General Permit. The General Permit prohibits any discharges of storm water associated with industrial activities that do not satisfy the BAT and BCT standards, as applicable. Effluent Limitation B(3) of the General Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants. BAT and BCT include both nonstructural and structural measures. General Permit, Section A(8). Conventional pollutants are TSS, O&G, pH, biochemical oxygen demand ("BOD"), and fecal coliform. 40 C.F.R. § 401.16. All other pollutants are either toxic or nonconventional. *Id.*; 40 C.F.R. § 401.15.

Receiving Water Limitation C(1) of the General Industrial Storm Water Permit prohibits storm water discharges and authorized non-storm water discharges to surface or groundwater that adversely impact human health or the environment. Receiving Water Limitation C(2) of the General Industrial Storm Water Permit also prohibits storm water discharges and authorized non-storm water discharges that cause or contribute to an exceedence of any applicable water quality standards contained in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

Eastlake Sanitary Landfill has been operating, and continuous to operate, without adequate BMPs that meet the BAT and BCT standards since at least February 7, 2004. Among several other major management failures, erosion at the site poses a significant

threat to the quality of the receiving waters. CSPA notes that the public record contains inspection reports dating back to the year 2000 wherein inspectors admonished Eastlake Sanitary Landfill that its erosion control and storm water pollution prevention BMPs were inadequate. Subsequently, in 2004, 2006, and 2007 the Regional Board again notified Landfill personnel of this issue on several occasion and ordered Eastlake Sanitary Landfill to implement adequate BMPs and update its SWPPP. Despite these notifications and orders, Eastlake Sanitary Landfill continues to operate in violation of the General Permit for failure to satisfy the BAT and BCT standards.

On February 10, 2004, Regional Board inspectors issued a report regarding the Landfill and found:

> Board staff observed several areas where unprotected soil on steep slopes had eroded significantly and evidence that soil and sediment-laden storm water were discharged from the landfill property to Molesworth Creek and an un-named [sic] tributary of Cache Creek. Inadequate erosion and sediment controls and inadequate or non-existent storm water conveyance systems were also observed at the site. Board staff also noted that the 1999 Storm Water Pollution Prevention Plan (SWPPP) needs to be updated to incorporate new expanded landfill area as well as the borrow soil stockpile area, and to provide a greater degree of protection for erosion and additional storm water conveyance and sedimentation systems.

Specifically, the inspectors observed that several slopes had inadequate protection to prevent erosion, which has "caused storm water conveyance systems . . . to be plugged and allowed the discharge of eroded soil and turbid water to waters of the state in violation of the Storm Water Permit and the Regional Board's Basin Plan." Inspectors also found that the Landfill's sediment ponds were not adequate and that storm water conveyance systems were "completely absent" along the eastside of the Landfill property. The Regional Board ordered the Landfill to develop additional BMPs to address these problems and to report a schedule for implementation by February 27, 2004 and an updated SWPPP by June 1, 2004, with all BMPs to be implemented by the start of the 2004-2005 Wet Season. CSPA is informed and believes that the Landfill failed to comply with the Board's order.

On December 1, 2006, the Regional Board issued another report that found that soil washing from the roads at the Landfill to adjacent creeks was occurring in violation of the Landfill's storm water permit. The inspector found that a new road had been constructed along an unnamed creek to the east of the Landfill. The inspector further found that "the drainage from the sediment pond would intersect the dirt fill of the road, but there was no culvert or other means to keep the road from washing away and into the creek." The inspector also expressed concern that leachate or runoff was allowed to flow into Molesworth Creek. The inspector informed Landfill personnel that if such

discharges occurred, they would constitute violations of the Landfill's permits. The inspectors also observed trash that had accumulated at both ends of the drainage channel above the landfill and blocked the storm water drains.

On March 30, 2007, the Regional Board sent Eastlake Sanitary Landfill a further communication stating that the Board had reviewed the Landfill's 2005-2006 Annual Report and found that the high levels of pollutants in storm water discharged from the Landfill indicated that BMPs at the site were inadequate. The Board ordered the Landfill to (1) identify sources of pollutants at the Landfill; (2) review its BMPs; and (3) modify or implement BMPs to reduce or eliminate the discharge of pollutants to comply with the Permit. The Board also ordered the Landfill to modify its SWPPP and Monitoring Plan to reflect the improved BMPs. Based on the continuing discharge of high levels of pollutants in the Landfill's storm water, CSPA is informed and believes that the Eastlake Sanitary Landfill again failed to comply with the Board's directives.

Also on March 30, 2007, the Regional Board issued a Notice of Violation to Eastlake Sanitary Landfill stating that the Landfill's 2005-2006 Annual Report was incomplete. The Board ordered the Landfill to submit its complete report by May 4, 2007. Based on its review of publicly available documents, CSPA does not believe that the Eastlake Sanitary Landfill complied with this order.

**A.      Eastlake Sanitary Landfill Has Discharged, And Continues To Discharge, Storm Water Containing Pollutants in Violation of the General Permit.**

Eastlake Sanitary Landfill has discharged and continues to discharge storm water with unacceptable levels of pH, total suspended solids (TSS), specific conductivity, iron, magnesium, and nitrates in violation of the General Industrial Storm Water Permit. These high pollutant levels have been documented during significant rain events, including the rain events indicated in the table of rain data attached hereto as Attachment A. Eastlake Sanitary Landfill's Annual Reports and Sampling and Analysis Results confirm discharges of materials other than storm water and specific pollutants in violation of the Permit provisions listed above. Self-monitoring reports under the Permit are deemed "conclusive evidence of an exceedance of a permit limitation." *Sierra Club v. Union Oil*, 813 F.2d 1480, 1493 (9th Cir. 1988).

The following discharges of pollutants from the Eastlake Sanitary Landfill have violated Discharge Prohibitions A(1) and A(2) and Receiving Water Limitations C(1) and C(2) of the General Industrial Storm Water Permit:

**1.      *Discharges of Storm Water with a pH Outside the Acceptable Range of Applicable Water Quality Criteria.***

| Date | Outfall | Parameter | Measured pH level | EPA Benchmark |
|------|---------|-----------|-------------------|---------------|

Notice of Violation and Intent To File Suit
February 7, 2009
Page 9 of 20

| | | | of Sample | Value |
|---|---|---|---|---|
| 12/18/2007 | SWMS #1 | pH | 2.4 | 6.0 – 9.0 |
| 12/18/2007 | SWMS #2 | pH | 2.37 | 6.0 – 9.0 |
| 12/18/2007 | SWMS #3 | pH | 3.72 | 6.0 – 9.0 |
| 2/26/2007 | SWMS #1 | pH | 4.86 | 6.0 – 9.0 |
| 2/26/2007 | SWMS #2 | pH | 4.64 | 6.0 – 9.0 |
| 2/26/2007 | SWMS #3 | pH | 4.43 | 6.0 – 9.0 |
| 12/13/2006 | SWMS #1 | pH | 3.96 | 6.0 – 9.0 |
| 12/13/2006 | SWMS #2 | pH | 3.76 | 6.0 – 9.0 |
| 12/13/2006 | SWMS #3 | pH | 5.93 | 6.0 – 9.0 |
| 3/2/2006 | SWMS #1 | pH | 5.29 | 6.0 – 9.0 |
| 3/2/2006 | SWMS #3 | pH | 5.63 | 6.0 – 9.0 |

2.      *Discharges of Storm Water Containing Total Suspended Solids at Concentrations in Excess of Applicable Water Quality Criteria.*

The General Permit and the Landfill's 1998 Storm Water Monitoring & Reporting Plan clearly require the Landfill to monitor its discharges for total suspended solids ("TSS"). *Despite these requirements, Eastlake Sanitary Landfill failed to monitor its storm water for TSS in three of the last five years.* Moreover, where Eastlake Sanitary Landfill did monitor its storm water for TSS, CSPA believes that its monitoring methods were inadequate. Clearly, erosion is a major problem at the site and eroded soils and gravel are discharged in storm water from the Landfill. In any event, despite Eastlake Sanitary Landfill's failure to monitor for TSS on a consistent basis, its own monitoring indicates storm water discharges containing TSS in excess of the applicable Benchmark Value on at least one occasion:

| Date | Outfall | Parameter | Concentration in Discharge | EPA Benchmark Value |
|---|---|---|---|---|
| 12/18/2007 | SWMS #3 | TSS | 610 mg/L | 100 mg/L |

3.      *Discharges of Storm Water Containing Specific Conductivity at Levels in Excess of Applicable Water Quality Criteria.*

| Date | Outfall | Parameter | Concentration in Discharge | Proposed Benchmark Value |
|---|---|---|---|---|
| 12/18/2007 | SWMS #1 | Spec. Con. | 210 μmho/cm | 200 μmhos/cm |
| 12/18/2007 | SWMS #2 | Spec. Con. | 231 μmho/cm | 200 μmho/cm |
| 12/18/2007 | SWMS #3 | Spec. Con. | 329 μmho/cm | 200 μmho/cm |
| 2/26/2007 | SWMS #2 | Spec. Con. | 323 μmho/cm | 200 μmho/cm |
| 2/26/2007 | SWMS #3 | Spec. Con. | 347 μmho/cm | 200 μmho/cm |
| 12/13/2006 | SWMS #1 | Spec. Con. | 327 μmho/cm | 200 μmho/cm |

| 12/13/2006 | SWMS #2 | Spec. Con. | 536 μmho/cm | 200 μmho/cm |
| 12/13/2006 | SWMS #3 | Spec. Con. | 509 μmho/cm | 200 μmho/cm |
| 11/8/2005 | SWMS #1 | Spec. Con. | 222 μmho/cm | 200 μmho/cm |
| 11/8/2005 | SWMS #2 | Spec. Con. | 210 μmho/cm | 200 μmho/cm |
| 1/26/2005 | SWMS #1 | Spec. Con. | 330 μmho/cm | 200 μmho/cm |
| 1/26/2005 | SWMS #2 | Spec. Con. | 219 μmho/cm | 200 μmho/cm |
| 1/26/2005 | SWMS #3 | Spec. Con. | 325 μmho/cm | 200 μmho/cm |
| 10/19/2004 | SWMS #2 | Spec. Con. | 305 μmho/cm | 200 μmho/cm |
| 3/2/2004 | SWMS #1 | Spec. Con. | 335 μmho/cm | 200 μmho/cm |
| 3/2/2004 | SWMS #2 | Spec. Con. | 223 μmho/cm | 200 μmho/cm |
| 3/2/2004 | SWMS #3 | Spec. Con. | 345 μmho/cm | 200 μmho/cm |
| 12/2/2003 | SWMS #1 | Spec. Con. | 468 μmho/cm | 200 μmho/cm |
| 12/2/2003 | SWMS #2 | Spec. Con. | 307 μmho/cm | 200 μmho/cm |

**4.** **_Discharges of Storm Water Containing Iron at Concentrations in Excess of Applicable Water Quality Criteria._**

Eastlake Sanitary Landfill has further failed to analyze its storm water for the presence of iron during most sampling events conducted since February 7, 2004. When it did analyze its storm water for the presence of iron, it tended to find high concentrations in excess of the EPA Parameter Benchmark Value and other applicable water quality criteria. The storm water samples for which Eastlake Sanitary Landfill analyzed for iron and found them to contain excess concentrations of iron are summarized below:

| Date | Outfall | Parameter | Concentration in Discharge | EPA Benchmark Value |
| --- | --- | --- | --- | --- |
| 3/2/2006 | SWMS #1 | Iron | 3.4 mg/L | 1.0 mg/L |
| 3/2/2006 | SWMS #2 | Iron | 1.1 mg/L | 1.0 mg/L |
| 3/2/2006 | SWMS #3 | Iron | 3.2 mg/L | 1.0 mg/L |
| 11/8/2005 | SWMS #1 | Iron | 1.6 mg/L | 1.0 mg/L |
| 11/8/2005 | SWMS #2 | Iron | 22 mg/L | 1.0 mg/L |
| 11/8/2005 | SWMS #3 | Iron | 14 mg/L | 1.0 mg/L |

**5.** **_Discharges of Storm Water Containing Magnesium at Concentrations in Excess of Applicable Water Quality Criteria._**

Eastlake Sanitary Landfill has monitored its storm water for magnesium on every occasion it collected storm water samples over the last five years. _On each occasion, analytical results indicated that the Landfill was discharging storm water containing magnesium far in excess of the EPA Benchmark Value -- on several occasions more than 500 times the Benchmark Value._ Despite this information, the Landfill failed to improve its BMPs or otherwise reduce the discharge of magnesium and other pollutants in its

Notice of Violation and Intent To File Suit
February 7, 2009
Page 11 of 20

storm water.  The analytical results for samples analyzed for magnesium are provided below:

| Date | Outfall | Parameter | Concentration in Discharge | EPA Benchmark Value |
|------|---------|-----------|----------------------------|---------------------|
| 12/18/2007 | SWMS #1 | Magnesium | 15 mg/L | 0.0636 mg/L |
| 12/18/2007 | SWMS #2 | Magnesium | 18 mg/L | 0.0636 mg/L |
| 12/18/2007 | SWMS #3 | Magnesium | 33 mg/L | 0.0636 mg/L |
| 2/26/2007 | SWMS #1 | Magnesium | 9.4 mg/L | 0.0636 mg/L |
| 2/26/2007 | SWMS #2 | Magnesium | 26 mg/L | 0.0636 mg/L |
| 2/26/2007 | SWMS #3 | Magnesium | 30 mg/L | 0.0636 mg/L |
| 12/13/2006 | SWMS #1 | Magnesium | 21 mg/L | 0.0636 mg/L |
| 12/13/2006 | SWMS #2 | Magnesium | 37 mg/L | 0.0636 mg/L |
| 12/13/2006 | SWMS #3 | Magnesium | 36 mg/L | 0.0636 mg/L |
| 3/2/2006 | SWMS #1 | Magnesium | 19 mg/L | 0.0636 mg/L |
| 3/2/2006 | SWMS #2 | Magnesium | 17 mg/L | 0.0636 mg/L |
| 3/2/2006 | SWMS #3 | Magnesium | 7.1 mg/L | 0.0636 mg/L |
| 11/8/2005 | SWMS #1 | Magnesium | 15 mg/L | 0.0636 mg/L |
| 11/8/2005 | SWMS #2 | Magnesium | 32 mg/L | 0.0636 mg/L |
| 11/8/2005 | SWMS #3 | Magnesium | 20 mg/L | 0.0636 mg/L |

## 6. *Discharges of Storm Water Containing Nitrate+Nitrite at Concentrations in Excess of Applicable Water Quality Criteria.*

Eastlake Sanitary Landfill is required to monitor its storm water for the presence of ammonia ($NH_3$).  General Permit, at 43 (Table D).  Based on its review of available documents, CSPA is informed and believes that Eastlake Sanitary Landfill has never monitored for ammonia during the past five years.  Instead, Eastlake Sanitary Landfill has intermittently analyzed its storm water for the presence of nitrates.  The EPA has set a Benchmark Value for total nitrates+nitrites ("N+N") permitted at 0.68 mg/L.  Though Eastlake Sanitary Landfill has failed to monitor for nitrites, thereby even making this monitoring effort inadequate, the observed concentrations of nitrates alone have exceeded the Benchmark Value on at least six occasions, as summarized below:

| Date | Outfall | Parameter | Concentration in Discharge | EPA Benchmark Value |
|------|---------|-----------|----------------------------|---------------------|
| 12/18/2007 | SWMS #1 | Nitrate | 0.95 mg/L | 0.68 mg/L |
| 12/13/2006 | SWMS #3 | Nitrate | 4.8 mg/L | 0.68 mg/L |
| 11/8/2005 | SWMS #1 | Nitrate | 2.7 mg/L | 0.68 mg/L |
| 11/8/2005 | SWMS #2 | Nitrate | 0.77 mg/L | 0.68 mg/L |
| 11/8/2005 | SWMS #3 | Nitrate | 1.7 mg/L | 0.68 mg/L |
| 10/19/2004 | SWMS #1 | Nitrate | 3.5 mg/L | 0.68 mg/L |

Notice of Violation and Intent To File Suit
February 7, 2009
Page 12 of 20

| 12/2/2003 | SWMS #1 | Nitrate | 11 mg/L | 0.68 mg/L |
| 12/2/2003 | SWMS #2 | Nitrate | 5 mg/L | 0.68 mg/L |

7.    *A Review of Publicly-available Documents Indicates that Eastlake Sanitary Landfill Has Discharged and Continues to Discharge Storm Water Containing Pollutants in Excess of the EPA Benchmark Values.*

CSPA's investigation, including its review of Eastlake Sanitary Landfill's analytical results documenting pollutant levels in the Landfill's storm water discharges well in excess of EPA's benchmark values and the State Board's proposed benchmark for electrical conductivity, indicates that Eastlake Sanitary Landfill has not implemented BAT and BCT at the Landfill for its discharges of pH, TSS, specific conductivity, iron, magnesium, nitrate+nitrite, and other pollutants, in violation of Effluent Limitation B(3) of the General Permit. Eastlake Sanitary Landfill was required to have implemented BAT and BCT by no later than October 1, 1992 or the start of its operations. Thus, Eastlake Sanitary Landfill is discharging polluted storm water associated with its industrial operations without having achieved the BAT and BCT standards.

CSPA is informed and believes that Eastlake Sanitary Landfill has known that its storm water contains pollutants at levels exceeding EPA Benchmarks and other water quality criteria since at least February 7, 2004. CSPA alleges that such violations also have occurred and will occur on other rain dates, including during every single significant rain event that has occurred since February 7, 2004, and that will occur at the Landfill subsequent to the date of this Notice of Violation and Intent to File Suit. Attachment A, attached hereto, sets forth each of the specific rain dates on which CSPA alleges that Eastlake Sanitary Landfill has discharged storm water containing impermissible levels of pH, TSS, and specific conductivity, and other un-monitored pollutants in violation of Discharge Prohibitions A(1) and A(2) and Receiving Water Limitations C(1) and C(2) of the General Industrial Storm Water Permit.

These unlawful discharges from the Landfill are ongoing. Each discharge of storm water containing any pollutants from the Landfill without the implementation of BAT/BCT constitutes a separate violation of the General Industrial Storm Water Permit and the Act. Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, Eastlake Sanitary Landfill is subject to penalties for violations of the General Industrial Storm Water Permit and the Act since February 7, 2004.

B.    **Eastlake Sanitary Landfill Has Failed to Implement an Adequate Monitoring & Reporting Plan.**

Notice of Violation and Intent To File Suit
February 7, 2009
Page 13 of 20

Section B of the General Industrial Storm Water Permit requires that dischargers develop and implement an adequate Monitoring and Reporting Plan ("MRP") by no later than October 1, 1992 or the start of operations. Sections B(3), B(4) and B(7) require that dischargers conduct regularly scheduled visual observations of non-storm water and storm water discharges from the Landfill and to record and report such observations to the Regional Board. Section B(5)(a) of the General Industrial Storm Water Permit requires that dischargers "shall collect storm water samples during the first hour of discharge from (1) the first storm event of the wet season, and (2) at least one other storm event in the wet season. All storm water discharge locations shall be sampled." Section B(5)(c)(i) further requires that the samples shall be analyzed for total suspended solids, pH, specific conductance, and total organic carbon. Oil and grease may be substituted for total organic carbon. Facilities such as Eastlake Sanitary Landfill that are designated as SIC 4953 are also required to analyze their storm water discharge for ammonia ($NH_3$), magnesium, chemical oxygen demand, arsenic, cadmium, CN, iron, lead, mercury, selenium, and silver. Section B(5)(c)(ii) of the General Permit requires dischargers to analyze samples for all "[t]oxic chemicals and other pollutants that are likely to be present in storm water discharges in significant quantities."

Based on its investigation, CSPA is informed and believes that Eastlake Sanitary Landfill has failed to develop and implement an adequate Monitoring & Reporting Plan. First, Eastlake Sanitary Landfill has failed to collect storm water samples from each discharge point during at least two qualifying storm events (as defined by the General Permit) during each of the past five years. Second, Eastlake Sanitary Landfill has failed to analyze its storm water samples for all pollutants required by the General Permit during each sampling event over the past five years. Third, Eastlake Sanitary Landfill has failed to conduct all required visual observations of non-storm water and storm water discharges at the Landfill. Each of these failures constitutes a separate and ongoing violation of the General Permit and the Act. Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, Eastlake Sanitary Landfill is subject to penalties for violations of the General Industrial Storm Water Permit and the Act since February 7, 2004. These violations are set forth in greater detail below.

> **1.** **Eastlake Sanitary Landfill Has Failed to Collect Storm Water Samples from Each Discharge Point During at least Two Rain Events In Each of the Last Five Years.**

Based on its review of publicly available documents, CSPA is informed and believes that Eastlake Sanitary Landfill has failed to collect at least two storm water samples from all discharge points during qualifying rain events at the Landfill during each of the past five years. In its most recent Annual Report to the Regional Board, Eastlake Sanitary Landfill stated that there are three discharge points at the Landfill. (Eastlake Sanitary Landfill, 2007-2008 Annual Report, at 2, item E.3). However, the Regional Board's inspection reports from 2004, 2006 and 2007 indicate that there are several uncontrolled discharge points at the Landfill. Eastlake Sanitary Landfill

Notice of Violation and Intent To File Suit
February 7, 2009
Page 14 of 20

apparently continues to ignore these unnamed discharge points and has never collected storm water samples from them during the past five years.

Eastlake Sanitary Landfill also failed to collect from its three designated discharge points. During the 2003-2004 Wet Season, Eastlake Sanitary Landfill failed to collect a second sample from SWMS #3, stating only that that it was "Dry". Eastlake Sanitary Landfill is not exempt from collecting at least two samples *from each discharge point* simply because they do not all discharge on the same day. The Landfill's failure to collect a second samples from SWMS #3 during the 2003-2004 constitutes a violation of the General Permit. During the 2007-2008, Eastlake Sanitary Landfill collected only one sample from each discharge point during the entire Wet Season. Despite the requirement that dischargers explain why less than two samples were collected, Eastlake Sanitary Landfill did not offer any written explanation with its Annual Report.

Each of these failures to adequately monitor storm water discharges constitutes a separate and ongoing violation of the General Industrial Storm Water Permit and the Clean Water Act.

> **2.      *Eastlake Sanitary Landfill Has Failed to Analyze Its Storm Water for All Pollutants Required by the General Industrial Storm Water Permit.***

Section B(5)(c)(i) of the General Industrial Storm Water Permit requires Eastlake Sanitary Landfill to sample for total suspended solids, specific conductivity, pH, and oil & grease or total organic carbons. The General Permit also requires facilities such as Eastlake Sanitary Landfill which are designated as SIC 4953 to analyze their storm water discharge for ammonia ($NH_3$), magnesium, chemical oxygen demand, arsenic, cadmium, CN, iron, lead, mercury, selenium and silver. Finally, the General Permit requires Eastlake Sanitary Landfill to analyze its storm water for "all pollutants likely to be present in significant concentrations." General Permit, § B(5)(c)(ii)

Eastlake Sanitary Landfill has continually failed to analyze its storm water discharges for all pollutants required by the General Permit. For example, Eastlake Sanitary Landfill failed to monitor its storm water for total suspended solids during the 2004-2005, 2005-2006 and 2006-2007 Wet Seasons despite the fact that Regional Board personnel regularly informed Landfill personnel that erosion was a major problem at the Landfill. Eastlake Sanitary Landfill also failed to monitor for the presence of oil & grease and/or total organic carbon ("TOC") during the same years. Eastlake Sanitary Landfill failed to monitor for iron during the 2003-2004, 2004-2005 and 2007-2008 Wet Seasons; it also failed to monitor for iron for all discharges during the 2006-2007 Wet Season. *Based on its review of available public documents, CSPA is informed and believes that the Landfill has never monitored its storm water for ammonia, arsenic, cadmium, COD, CN, lead, mercury, selenium, or silver.* Notably, many—but not all—of these chemicals are listed as "Analytical Parameters" and "Constituents of Concern" in Table I of the 1998 Storm Water Monitoring & Reporting Plan that accompanies the

Notice of Violation and Intent To File Suit
February 7, 2009
Page 15 of 20

1998 Landfill SWPPP. Eastlake Sanitary Landfill has thus knowingly failed to analyze
its storm water discharges even for the parameters set forth in its own SWPPP/MRP.

Finally, CSPA is informed and believes that Eastlake Sanitary Landfill has failed
to monitor for at least six other pollutants likely to be present in storm water discharges in
significant quantities – aluminum, chromium, copper, manganese, nickel, and zinc.
Eastlake Sanitary Landfill's failure to monitor these pollutants extends back at least until
February 7, 2004. Eastlake Sanitary Landfill's failure to monitor these mandatory
parameters has caused and continues to cause multiple separate and ongoing violations of
the Permit and the Act.

> **3.** **_Eastlake Sanitary Landfill Is Subject to Penalties for Its Failure_**
> **_to Implement an Adequate Monitoring & Reporting Plan Since_**
> **_February 7, 2004._**

CSPA is informed and believes that available documents demonstrate Eastlake
Sanitary Landfill's consistent and ongoing failure to implement an adequate Monitoring
Reporting Plan in violation of Section B of the General Industrial Storm Water Permit.
Consistent with the five-year statute of limitations applicable to citizen enforcement
actions brought pursuant to the federal Clean Water Act, Eastlake Sanitary Landfill is
subject to penalties for these violations of the General Industrial Storm Water Permit and
the Act since February 7, 2004.

**C.    Eastlake Sanitary Landfill Has Failed to Implement BAT and BCT.**

Effluent Limitation B(3) of the General Industrial Storm Water Permit requires
dischargers to reduce or prevent pollutants in their storm water discharges through
implementation of BAT for toxic and nonconventional pollutants and BCT for
conventional pollutants. BAT and BCT include both nonstructural and structural
measures. General Permit, Section A(8). CSPA's investigation indicates that Eastlake
Sanitary Landfill has not implemented BAT and BCT at the Landfill for its discharges of
TSS, specific conductivity, pH, iron, magnesium, nitrate+nitrite, and other unmonitored
pollutants in violation of Effluent Limitation B(3) of the General Industrial Storm Water
Permit.

To meet the BAT/BCT requirement of the General Permit, Eastlake Sanitary
Landfill must evaluate all pollutant sources at the Landfill and implement the best
structural and non-structural management practices economically achievable to reduce or
prevent the discharge of pollutants from the Landfill. Based on the limited information
available regarding the internal structure of the Landfill, CSPA believes that at a
minimum Eastlake Sanitary Landfill must implement additional erosion control
measures, increase the efficacy of its sediment pond, improve housekeeping practices,
store materials that act as pollutant sources under cover or in contained areas, treat storm
water to reduce pollutants before discharge (e.g., with filters or treatment boxes), and/or

prevent storm water discharge altogether.  Eastlake Sanitary Landfill has failed to
implement such measures adequately.

Eastlake Sanitary Landfill was required to have implemented BAT and BCT by
no later than October 1, 1992.  Therefore, Eastlake Sanitary Landfill has been in
continuous violation of the BAT and BCT requirements every day since October 1, 1992,
and will continue to be in violation every day that Eastlake Sanitary Landfill fails to
implement BAT and BCT.  Eastlake Sanitary Landfill is subject to penalties for
violations of the Order and the Act occurring since February 7, 2004.

**D.    Eastlake Sanitary Landfill Has Failed to Develop and Implement an
Adequate Storm Water Pollution Prevention Plan.**

Section A(1) and Provision E(2) of the General Industrial Storm Water Permit
require dischargers of storm water associated with industrial activity to develop,
implement, and update an adequate storm water pollution prevention plan ("SWPPP") no
later than October 1, 1992.  Section A(1) and Provision E(2) requires dischargers who
submitted an NOI pursuant to the Order to continue following their existing SWPPP and
implement any necessary revisions to their SWPPP in a timely manner, but in any case,
no later than August 1, 1997.

The SWPPP must, among other requirements, identify and evaluate sources of
pollutants associated with industrial activities that may affect the quality of storm and
non-storm water discharges from the facility and identify and implement site-specific
best management practices ("BMPs") to reduce or prevent pollutants associated with
industrial activities in storm water and authorized non-storm water discharges (General
Permit, Section A(2)).  The SWPPP must also include BMPs that achieve BAT and BCT
(Effluent Limitation B(3)).

The SWPPP must include: a description of individuals and their responsibilities
for developing and implementing the SWPPP (General Permit, Section A(3)); a site map
showing the facility boundaries, storm water drainage areas with flow pattern and nearby
waterbodies, the location of the storm water collection, conveyance and discharge
system, structural control measures, impervious areas, areas of actual and potential
pollutant contact, and areas of industrial activity (General Permit, Section A(4)); a list of
significant materials handled and stored at the site (General Permit, Section A(5)); a
description of potential pollutant sources including industrial processes, material handling
and storage areas, dust and particulate generating activities, a description of significant
spills and leaks, a list of all non-storm water discharges and their sources, and a
description of locations where soil erosion may occur (General Permit, Section A(6)).

The SWPPP also must include an assessment of potential pollutant sources at the
Landfill and a description of the BMPs to be implemented at the Landfill that will reduce
or prevent pollutants in storm water discharges and authorized non-storm water
discharges, including structural BMPs where non-structural BMPs are not effective

(General Permit, Section A(7), (8)). The SWPPP must be evaluated to ensure effectiveness and must be revised where necessary (General Permit, Section A(9),(10)). Receiving Water Limitation C(3) of the Order requires that dischargers submit a report to the appropriate Regional Water Board that describes the BMPs that are currently being implemented and additional BMPs that will be implemented to prevent or reduce the discharge of any pollutants causing or contributing to the exceedence of water quality standards.

CSPA's investigation and review of available documents and photographs regarding current and historic conditions at the Landfill indicate that Eastlake Sanitary Landfill has been operating with an inadequately developed or implemented SWPPP in violation of the requirements set forth above. On several occasions, the Regional Board inspectors have informed Eastlake Sanitary Landfill that its BMPs and SWPPP are inadequate. Yet, Eastlake Sanitary Landfill has failed to evaluate the effectiveness of its BMPs and to revise its SWPPP as necessary. Moreover, upon reviewing the 1998 SWPPP, CSPA has concluded that it is clearly inadequate for several reasons, including: (1) the SWPPP site map fails to meet the requirements of the General Permit; (2) the SWPPP fails to identify all potential pollutants at the Landfill; and (3) the SWPPP fails to set forth adequate BMPs to achieve BAT/BCT at the Landfill.

Eastlake Sanitary Landfill has been in continuous violation of Section A(1) and Provision E(2) of the General Industrial Storm Water Permit every day since October 1, 1992, and will continue to be in violation every day that Eastlake Sanitary Landfill fails to develop and implement an effective SWPPP. Eastlake Sanitary Landfill is subject to penalties for violations of the Order and the Act occurring since February 7, 2004.

**E.      Eastlake Sanitary Landfill Has Failed to Address Discharges Contributing to Exceedances of Water Quality Standards.**

Receiving Water Limitation C(3) requires a discharger to prepare and submit a report to the Regional Board describing changes it will make to its current BMPs in order to prevent or reduce the discharge of any pollutant in its storm water discharges that is causing or contributing to an exceedance of water quality standards. Once approved by the Regional Board, the additional BMPs must be incorporated into the Landfill's SWPPP. The report must be submitted to the Regional Board no later than 60-days from the date the discharger first learns that its discharge is causing or contributing to an exceedance of an applicable water quality standard. Receiving Water Limitation C(4)(a). Section C(11)(d) of the Permit's Standard Provisions also requires dischargers to report any noncompliance. *See also* Provision E(6). Lastly, Section A(9) of the Permit requires an annual evaluation of storm water controls including the preparation of an evaluation report and implementation of any additional measures in the SWPPP to respond to the monitoring results and other inspection activities.

As indicated above, Eastlake Sanitary Landfill is discharging elevated levels of total suspended solids, specific conductivity, pH, iron, magnesium, and nitrates and other

Notice of Violation and Intent To File Suit
February 7, 2009
Page 18 of 20

pollutants that are causing or contributing to exceedances of applicable water quality standards. For each of these pollutants, Eastlake Sanitary Landfill was required to submit a report pursuant to Receiving Water Limitation C(4)(a) within 60-days of becoming aware of levels in its storm water exceeding the EPA Benchmarks and applicable water quality standards.

Based on CSPA's review of available documents, Eastlake Sanitary Landfill was aware of high levels of these pollutants prior to February 7, 2004. Yet, Eastlake Sanitary Landfill has not filed any reports describing its noncompliance with the General Industrial Storm Water Permit, in violation of Section C(11)(d). Lastly, the SWPPP and accompanying BMPs do not appear to have been altered as a result of the annual evaluation required by Section A(9).

Eastlake Sanitary Landfill has been in continuous violation of Receiving Water Limitation C(4)(a) and Sections C(11)(d) and A(9) of the General Industrial Storm Water Permit every day since February 7, 2004, and will continue to be in violation every day that Eastlake Sanitary Landfill fails to prepare and submit the requisite reports, receives approval from the Regional Board and amends its SWPPP to include appropriate BMPs. Eastlake Sanitary Landfill is subject to penalties for violations of the General Industrial Storm Water Permit and the Act occurring since February 7, 2004.

   F.   **Eastlake Sanitary Landfill Has Failed to File Timely, True and Correct Reports.**

Section B(14) of the General Industrial Storm Water Permit requires dischargers to submit an Annual Report by July 1st of each year to the executive officer of the relevant Regional Board. The Annual Report must be signed and certified by an appropriate corporate officer. General Permit, Sections B(14), C(9), (10). Section A(9)(d) of the General Industrial Storm Water Permit requires the discharger to include in their annual report an evaluation of their storm water controls, including certifying compliance with the General Industrial Storm Water Permit. *See also* General Permit, Sections C(9) and (10) and B(14).

CSPA's investigation indicates that Eastlake Sanitary Landfill has signed and submitted incomplete Annual Reports and purported to comply with the General Industrial Storm Water Permit despite significant noncompliance. As indicated above, Eastlake Sanitary Landfill has failed to comply with the Permit and the Act consistently for at least the past five years; therefore, Eastlake Sanitary Landfill has violated Sections A(9)(d), B(14) and C(9) & (10) of the Permit every time Eastlake Sanitary Landfill submitted an incomplete or incorrect annual report that falsely certified compliance with the Act in the past years. Eastlake Sanitary Landfill's failure to submit true and complete reports constitutes continuous and ongoing violations of the Permit and the Act. Eastlake Sanitary Landfill is subject to penalties for violations of Section (C) of the General Industrial Storm Water Permit and the Act occurring since February 7, 2004.

Notice of Violation and Intent To File Suit
February 7, 2009
Page 19 of 20

## III.   Persons Responsible for the Violations.

CSPA puts Eastlake Sanitary Landfill, the Lake County Department of Public Services, Kim Kevin Clymire in his official capacity, and Mr. Chuck Maves, on notice that they are the persons responsible for the violations described above. If additional persons are subsequently identified as also being responsible for the violations set forth above, CSPA hereby puts each of these noticees and the Eastlake Sanitary Landfill on further notice that it intends to include those persons in this enforcement action.

## IV.   Name and Address of Noticing Party.

Our name, address and telephone number are: California Sportfishing Protection Alliance, Bill Jennings, Executive Director; 3536 Rainier Avenue, Stockton, CA 95204; Phone: (209) 464-5067.

## V.   Counsel.

CSPA has retained legal counsel to represent it in this matter. Please direct all communications to:

| | |
|---|---|
| Andrew L. Packard | Michael R. Lozeau |
| Law Offices of Andrew L. Packard | Lozeau Drury LLP |
| 319 Pleasant Street | 1516 Oak Street, Suite 216 |
| Petaluma, California 94952 | Alameda, California 94501 |
| Tel. (707) 763-7227 | Tel. (510) 749-9102 |
| Fax. (707) 763-9227 | Fax. (510) 749-9103 |
| Andrew@PackardLawOffices.com | Michael@LozeauDrury.com |

## VI.   Penalties.

Pursuant to Section 309(d) of the Act (33 U.S.C. § 1319(d)) and the Adjustment of Civil Monetary Penalties for Inflation (40 C.F.R. § 19.4) each separate violation of the Act subjects Eastlake Sanitary Landfill to a penalty of up to $32,500 per day per violation for all violations occurring during the period commencing five years prior to the date of this Notice of Violations and Intent to File Suit. In addition to civil penalties, CSPA will seek injunctive relief preventing further violations of the Act pursuant to Sections 505(a) and (d) (33 U.S.C. §1365(a) and (d)) and such other relief as permitted by law. Lastly, Section 505(d) of the Act (33 U.S.C. § 1365(d)), permits prevailing parties to recover costs and fees, including attorneys' fees.

CSPA believes this Notice of Violations and Intent to File Suit sufficiently states grounds for filing suit. We intend to file a citizen suit under Section 505(a) of the Act against Eastlake Sanitary Landfill and its agents for the above-referenced violations upon the expiration of the 60-day notice period. If you wish to pursue remedies in the absence of litigation, we suggest that you initiate those discussions within the next 20 days so that

Notice of Violation and Intent To File Suit
February 7, 2009
Page 20 of 20

they may be completed before the end of the 60-day notice period. We do not intend to delay the filing of a complaint in federal court if discussions are continuing when that period ends.

Sincerely,

Bill Jennings, Executive Director
California Sportfishing Protection Alliance

## SERVICE LIST

Lisa Jackson, Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

Administrator, U.S. EPA – Region 9
75 Hawthorne Street
San Francisco, CA, 94105

Hon. Eric Holder, U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001

Dorothy R. Rice, Executive Director
State Water Resources Control Board
1001 I Street Sacramento, CA 95814
P.O. Box 100
Sacramento, CA 95812-0100

Pamela Creedon, Executive Officer
Regional Water Quality Control Board
Central Valley Region
11020 Sun Center Drive #200
Rancho Cordova, CA 95670-6114

**ATTACHMENT A**
**Notice of Intent to File Suit, Eastlake Sanitary Landfill (Clear Lake, CA)**
**Significant Rain Events,\* January 20, 2004-January 20, 2009**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| March | 16 | 2006 | March | 06 | 2008 | March | 10 | 2008 |
| Oct. | 14 | 2007 | March | 08 | 2008 | Nov. | 26 | 2008 |
| Nov. | 08 | 2007 | March | 20 | 2008 | Dec. | 23 | 2008 |
| Nov. | 12 | 2007 | Sep. | 17 | 2008 | Jan. | 11 | 2009 |
| Nov. | 20 | 2007 | Oct. | 30 | 2008 | Feb. | 27 | 2004 |
| Nov. | 29 | 2007 | Nov. | 18 | 2008 | April | 20 | 2004 |
| Dec. | 05 | 2007 | Nov. | 21 | 2008 | Oct. | 28 | 2005 |
| Dec. | 08 | 2007 | Dec. | 14 | 2008 | Jan. | 19 | 2006 |
| Dec. | 19 | 2007 | Dec. | 21 | 2008 | Jan. | 27 | 2006 |
| Feb. | 22 | 2008 | Jan. | 02 | 2009 | Jan. | 17 | 2008 |
| Feb. | 27 | 2008 | Jan. | 03 | 2009 | Jan. | 18 | 2008 |
| March | 12 | 2008 | Nov. | 28 | 2005 | Jan. | 25 | 2008 |
| March | 31 | 2008 | Jan. | 03 | 2006 | Jan. | 26 | 2008 |
| Oct. | 26 | 2008 | Nov. | 24 | 2007 | Feb. | 02 | 2008 |
| Nov. | 08 | 2008 | Dec. | 06 | 2007 | March | 25 | 2008 |
| Nov. | 12 | 2008 | Dec. | 29 | 2007 | Jan. | 17 | 2009 |
| Nov. | 20 | 2008 | Jan. | 21 | 2008 | Jan. | 18 | 2009 |
| Nov. | 29 | 2008 | Jan. | 29 | 2008 | Dec. | 29 | 2005 |
| Dec. | 05 | 2008 | Feb. | 10 | 2008 | Nov. | 10 | 2007 |
| Dec. | 08 | 2008 | May | 28 | 2008 | Nov. | 22 | 2007 |
| Dec. | 19 | 2008 | Oct. | 28 | 2008 | Nov. | 30 | 2007 |
| Feb. | 15 | 2004 | Nov. | 24 | 2008 | Dec. | 01 | 2007 |
| April | 11 | 2007 | Dec. | 06 | 2008 | Dec. | 25 | 2007 |
| Sep. | 20 | 2007 | Dec. | 29 | 2008 | Dec. | 27 | 2007 |
| Oct. | 18 | 2007 | Jan. | 27 | 2004 | Jan. | 05 | 2008 |
| Dec. | 15 | 2007 | Oct. | 17 | 2004 | Feb. | 01 | 2008 |
| Dec. | 17 | 2007 | April | 02 | 2006 | Feb. | 28 | 2008 |
| Jan. | 28 | 2008 | Feb. | 26 | 2007 | Feb. | 29 | 2008 |
| Jan. | 31 | 2008 | April | 15 | 2007 | March | 04 | 2008 |
| March | 07 | 2008 | April | 20 | 2007 | Nov. | 10 | 2008 |
| March | 21 | 2008 | Nov. | 13 | 2007 | Nov. | 22 | 2008 |
| April | 11 | 2008 | Nov. | 23 | 2007 | Nov. | 30 | 2008 |
| Dec. | 15 | 2008 | Dec. | 30 | 2007 | Dec. | 01 | 2008 |
| Dec. | 17 | 2008 | Jan. | 19 | 2008 | Dec. | 25 | 2008 |
| Feb. | 18 | 2005 | Jan. | 22 | 2008 | Dec. | 27 | 2008 |
| May | 08 | 2005 | Feb. | 23 | 2008 | Jan. | 05 | 2009 |
| May | 10 | 2005 | March | 16 | 2008 | Nov. | 04 | 2004 |
| Jan. | 29 | 2006 | March | 17 | 2008 | March | 11 | 2006 |
| Oct. | 04 | 2006 | March | 22 | 2008 | March | 15 | 2006 |
| Nov. | 18 | 2007 | March | 27 | 2008 | March | 31 | 2006 |
| Nov. | 21 | 2007 | Nov. | 13 | 2008 | Dec. | 10 | 2007 |
| Dec. | 14 | 2007 | Nov. | 23 | 2008 | Dec. | 28 | 2007 |
| Dec. | 21 | 2007 | Dec. | 30 | 2008 | Jan. | 20 | 2008 |
| Jan. | 02 | 2008 | March | 24 | 2006 | Feb. | 04 | 2008 |
| Jan. | 03 | 2008 | Nov. | 02 | 2006 | Feb. | 12 | 2008 |
| Feb. | 11 | 2008 | Nov. | 26 | 2007 | March | 24 | 2008 |
| Feb. | 15 | 2008 | Dec. | 23 | 2007 | Dec. | 10 | 2008 |
| Feb. | 24 | 2008 | Jan. | 11 | 2008 | Dec. | 28 | 2008 |

\* Dates gathered from publicly available rain and weather data collected at stations located near the
Landfill.

**ATTACHMENT A**
**Notice of Intent to File Suit, Eastlake Sanitary Landfill (Clear Lake, CA)**
**Significant Rain Events,\* January 20, 2004-January 20, 2009**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Dec. | 11 | 2007 | Dec. | 22 | 2007 | Jan. | 15 | 2006 |
| Dec. | 24 | 2007 | Feb. | 06 | 2008 | March | 03 | 2006 |
| Feb. | 03 | 2008 | Feb. | 19 | 2008 | March | 21 | 2006 |
| March | 11 | 2008 | Nov. | 14 | 2008 | Jan. | 04 | 2008 |
| Oct. | 23 | 2008 | Nov. | 17 | 2008 | Jan. | 04 | 2009 |
| Dec. | 11 | 2008 | Dec. | 03 | 2008 | Jan. | 27 | 2008 |
| Dec. | 24 | 2008 | Dec. | 22 | 2008 | Feb. | 07 | 2008 |
| April | 07 | 2005 | Feb. | 27 | 2007 | March | 02 | 2005 |
| Dec. | 09 | 2007 | Jan. | 13 | 2008 | April | 11 | 2006 |
| Jan. | 12 | 2008 | Jan. | 13 | 2009 | Feb. | 19 | 2005 |
| Feb. | 09 | 2008 | Feb. | 24 | 2004 | Jan. | 14 | 2006 |
| Feb. | 14 | 2008 | Nov. | 25 | 2005 | Jan. | 03 | 2005 |
| Feb. | 18 | 2008 | Jan. | 21 | 2006 | March | 04 | 2005 |
| Dec. | 09 | 2008 | March | 04 | 2006 | April | 22 | 2007 |
| Jan. | 12 | 2009 | April | 10 | 2006 | Dec. | 31 | 2004 |
| Jan. | 02 | 2005 | Jan. | 01 | 2008 | Nov. | 03 | 2006 |
| April | 24 | 2005 | Feb. | 13 | 2008 | Jan. | 16 | 2008 |
| March | 01 | 2006 | Jan. | 01 | 2009 | Jan. | 16 | 2009 |
| Feb. | 05 | 2008 | Feb. | 23 | 2005 | Feb. | 04 | 2004 |
| Feb. | 08 | 2008 | March | 05 | 2006 | Feb. | 21 | 2005 |
| Feb. | 20 | 2008 | March | 13 | 2006 | Dec. | 21 | 2005 |
| March | 02 | 2008 | April | 17 | 2006 | March | 28 | 2006 |
| Nov. | 12 | 2004 | May | 20 | 2006 | Dec. | 29 | 2004 |
| Feb. | 27 | 2005 | Oct. | 11 | 2007 | Jan. | 09 | 2005 |
| March | 05 | 2005 | Jan. | 14 | 2008 | Jan. | 12 | 2005 |
| Dec. | 20 | 2005 | Jan. | 14 | 2009 | March | 02 | 2006 |
| Feb. | 02 | 2006 | Feb. | 07 | 2004 | Feb. | 08 | 2007 |
| Nov. | 11 | 2006 | May | 18 | 2005 | Jan. | 09 | 2008 |
| Dec. | 04 | 2007 | March | 25 | 2006 | Jan. | 09 | 2009 |
| Jan. | 07 | 2008 | March | 30 | 2006 | March | 07 | 2006 |
| Jan. | 24 | 2008 | Jan. | 15 | 2008 | April | 05 | 2006 |
| March | 05 | 2008 | Jan. | 23 | 2008 | April | 08 | 2006 |
| Dec. | 04 | 2008 | March | 03 | 2008 | June | 09 | 2005 |
| Jan. | 07 | 2009 | Jan. | 15 | 2009 | Dec. | 01 | 2005 |
| March | 21 | 2005 | Jan. | 24 | 2004 | Feb. | 20 | 2005 |
| Dec. | 30 | 2005 | Nov. | 16 | 2007 | Nov. | 11 | 2004 |
| Jan. | 01 | 2006 | Dec. | 12 | 2007 | April | 04 | 2005 |
| Jan. | 08 | 2008 | March | 01 | 2008 | April | 23 | 2006 |
| Feb. | 16 | 2008 | Nov. | 16 | 2008 | Nov. | 27 | 2006 |
| Feb. | 17 | 2008 | Dec. | 12 | 2008 | Feb. | 13 | 2007 |
| March | 13 | 2008 | Nov. | 13 | 2006 | Nov. | 10 | 2004 |
| Jan. | 08 | 2009 | Feb. | 28 | 2007 | April | 09 | 2005 |
| Feb. | 22 | 2004 | Nov. | 11 | 2007 | Jan. | 18 | 2006 |
| Jan. | 31 | 2006 | Feb. | 21 | 2008 | April | 13 | 2006 |
| Dec. | 21 | 2006 | March | 09 | 2008 | Feb. | 16 | 2004 |
| Oct. | 12 | 2007 | Nov. | 11 | 2008 | May | 19 | 2005 |
| Nov. | 14 | 2007 | Oct. | 29 | 2005 | Dec. | 02 | 2005 |
| Nov. | 17 | 2007 | Jan. | 01 | 2005 | Feb. | 25 | 2007 |
| Dec. | 03 | 2007 | Jan. | 04 | 2006 | Feb. | 02 | 2004 |

\* Dates gathered from publicly available rain and weather data collected at stations located near the Landfill.

**ATTACHMENT A**
**Notice of Intent to File Suit, Eastlake Sanitary Landfill (Clear Lake, CA)**
**Significant Rain Events,\* January 20, 2004-January 20, 2009**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Feb. | 22 | 2005 | March | 29 | 2006 | Jan. | 11 | 2005 |
| Dec. | 12 | 2006 | Dec. | 22 | 2006 | Dec. | 27 | 2006 |
| Oct. | 26 | 2004 | Dec. | 26 | 2005 | Dec. | 28 | 2005 |
| Dec. | 23 | 2005 | Jan. | 28 | 2005 | Dec. | 30 | 2004 |
| Dec. | 09 | 2006 | March | 17 | 2006 | May | 05 | 2005 |
| Nov. | 27 | 2004 | March | 19 | 2005 | Dec. | 19 | 2005 |
| May | 22 | 2006 | Jan. | 26 | 2005 | March | 22 | 2005 |
| Feb. | 17 | 2005 | March | 28 | 2005 | Feb. | 26 | 2004 |
| March | 02 | 2004 | Feb. | 22 | 2007 | Dec. | 07 | 2004 |
| March | 26 | 2004 | Dec. | 08 | 2004 | Feb. | 25 | 2004 |
| Jan. | 08 | 2005 | Jan. | 02 | 2006 | Dec. | 18 | 2005 |
| March | 20 | 2005 | March | 14 | 2006 | Feb. | 28 | 2006 |
| Jan. | 07 | 2005 | Oct. | 18 | 2004 | Nov. | 08 | 2005 |
| Dec. | 22 | 2005 | Feb. | 10 | 2007 | Feb. | 27 | 2006 |
| April | 01 | 2006 | Feb. | 28 | 2005 | Feb. | 18 | 2004 |
| April | 16 | 2006 | Nov. | 29 | 2005 | March | 06 | 2006 |
| Dec. | 10 | 2006 | Oct. | 20 | 2004 | April | 12 | 2006 |
| Feb. | 03 | 2004 | Feb. | 09 | 2007 | Dec. | 27 | 2004 |
| May | 09 | 2005 | April | 03 | 2006 | Dec. | 31 | 2005 |
| Feb. | 11 | 2007 | Dec. | 28 | 2004 | Feb. | 17 | 2004 |

\* Dates gathered from publicly available rain and weather data collected at stations located near the Landfill.

**EXHIBIT C**

| Parameter | EPA Benchmark |
|---|---|
| Aluminum | 0.75 mg/l |
| Arsenic | 0.16854 mg/L |
| Cadmium | 0.0159 mg/L |
| Chemical Oxygen Demand | 120.0 mg/L |
| Copper | 0.0636 mg/l |
| Iron | 1.0 mg/l |
| Lead | 0.0816 mg/L |
| Magnesium | 0.0636 mg/L |
| Mercury | 0.0024 mg/L |
| Oil & Grease | 15.0 mg/L |
| Nitrate + nitrite | 0.68 mg/L |
| pH | 6.5 – 8.5 |
| Selenium | 0.2385 mg/L |
| Silver | 0.318 mg/L |
| Specific Conductivity | 200 µmho/cm |
| Total Suspended Solids | 100.0 mg/L |
| Zinc | 0.117 mg/l |

**[PROPOSED] ORDER**

Good cause appearing, and the parties having stipulated and agreed,

IT IS HEREBY ORDERED that Plaintiff California Sportfishing Protection Alliance's claims against Defendants LAKE COUNTY, LAKE COUNTY DEPARTMENT OF PUBLIC SERVICES, KIM KEVIN CLYMIRE and CHUCK MAVES as set forth in the CWA Notice and Complaint filed in Case No. 3:09-cv-01756-SI, are hereby dismissed with prejudice.

IT IS FURTHER ORDERED that the Court shall retain and have jurisdiction over the Parties with respect to disputes arising under the agreement attached to the parties' Stipulation to Dismiss as Exhibit A.

**IT IS SO ORDERED.**

Dated: 4/6/10 _____

_____
United States District Court Judge